**SOUTHERN RAILWAY COMPANY,**
**Plaintiff,**

v.

**The FIDELITY AND CASUALTY COM-**
**PANY OF NEW YORK, Defendant.**

**Civ. A. No. 74–1707.**

United States District Court,
D. S. C.,
Columbia Division.

March 1, 1977.

Judgment affirmed, 4 Cir., 580 F.2d 1049.

John Gregg McMaster, Robert J. Thomas, Columbia, S. C., for plaintiff.

James W. Alford, Columbia, S. C., for defendant.

ORDER

CHAPMAN, District Judge.

This case was tried before the Court and jury on February 14, 1977. The plaintiff rested its case in the afternoon and various motions were made by the defendant for directed verdicts. All defense motions were denied and two defense witnesses were heard prior to the evening recess. That night the Court again considered defend-

ant's motions, studied the briefs of the parties and concluded that there was no factual issue for the jury that the defendant was entitled to judgment. Accordingly, the next morning, the defendant was granted a directed verdict and the jury was dismissed.

Basically, the case is a suit by Southern Railway to recover from its insurance company on a policy entitled "Railroad Protective Liability Policy." The policy was purchased by Hardaway Constructors, Inc., pursuant to an agreement between Hardaway and Southern. Hardaway was engaged in the construction of I–77, an interstate highway that crossed plaintiff's tracks at various points. Although Hardaway was not the contractor responsible for building the interstate over or under the railroad tracks, in the course of its work, it did have to move dirt across Southern's tracks between the highway construction work in progress on each side of the tracks. In order to accomplish this, Hardaway made an agreement with Southern for temporary right of way across Southern's tracks. By the terms of this agreement, Southern agreed to build the actual crossing and to deploy a flagman to the site when Hardaway intended to use the crossing. The flagman knew the train schedules and was in radio contact with any approaching train. Hardaway in turn built the dirt ramps approaching the crossing, paid Southern's flagman and procured the insurance policy in question. Hardaway also agreed to construct a barricade on each side of the crossing and did so by stretching a steel cable across the ramps on each side of the crossing. The cables were locked and could only be unlocked by the Southern flagman. Thus Hardaway could not use the crossing unless and until the flagman was present.

On Sunday, May 13, 1973, some young boys managed to start a bulldozer at the construction project and drive it upon the Southern Railroad tracks and left it there. When the train approached the crossing at approximately 7:05 p. m., the engineer and brakeman could not see the obstruction in time to stop the train and a collision ensued causing a massive derailment and causing personal injuries to the engineer and brakeman. Southern paid the engineer and brakeman for their injuries in return for releases and then sought recovery from the Fidelity and Casualty Company of New York under its Railroad Protective Liability Policy for the damage to its train and for the amounts paid the injured Southern employees. Southern alleges that the property damage losses resulting from the derailment exceeded $500,000.00 and the liability losses for payment made to its employees under the Federal Employers' Liability Act totaled $30,000.00.

The defendant insurance company denied coverage asserting that the accident which occurred was not one of the perils insured against. It relied on a provision of the policy which stated that the coverage was for losses "arising out of acts or omissions at the designated job site which are related to or are in connection with the work described in Item 4 of the Declarations. Item 4 of the policy is entitled "Designation of the Job Site and Description of Work." The pertinent description under this title was "Temporary Road or Driveway-'Crossing' at Milepost R–21–52– Rock Hill, S. C." The premium charged for the coverage at this site was $82 for personal injury liability and $32 for both liability and first party property damage coverages. Defendant asserts that any "omission" of Hardaway in failing to protect the heavy equipment from theft was not "related to or in connection with" the construction or use of the temporary crossing at Milepost R–21–52.

Southern's case consisted of seven witnesses and various exhibits. The policy was introduced at the outset along with a number of color photographs of the accident scene. Harold L. Hughes, the head brakeman on the train which wrecked, testified that the train carrying freight between Columbia and Charlotte made the trip approximately every other day, going from Columbia to Charlotte in the morning and returning in the afternoon. The train was traveling approximately 40 m. p. h. when he realized that a bulldozer was on the tracks. The brakes were applied but it was impossible to stop the train in time to avoid a

collision. The maximum speed permitted was either 45 or 50 m. p. h., so the train was traveling within the speed limit. Mr. Hughes stated that the train traveled even slower on weekdays when Hardaway was known to be working in the area. He also testified that the bulldozer was on the tracks approximately 60 feet south of the crossing when the collision occurred and caused the derailment and his injuries.

John Mac Robinson testified that he and a friend were responsible for the bulldozer being on the tracks; that they started the bulldozer and rode it back and forth across the temporary crossing until one of the treads got stuck on the rails; that they were unable to free the bulldozer and abandoned it while it was still on the crossing; and that this activity occurred in the early morning, but he admitted that he may have been mistaken. It is doubtful that he was correct about the time since the bulldozer was not on the tracks when the train passed the crossing on its morning run to Charlotte. The plaintiff's other five witnesses were put up to introduce a map of the accident scene, to establish the settlement sum paid to the injured engineer, and to show that Hardaway had previously experienced difficulty with unauthorized tampering with machinery at the job site during off hours.

■ Even though the Railroad Protective Liability Policy is a form policy which has been written for many years, this Court can find no case in which it has been judicially construed, thus the interpretation of this policy is an issue of first impression. It is the opinion of this Court that the policy in evidence by its terms does not provide coverage for the incident which caused the loss in this case. All of the claims by the plaintiff against the Fidelity and Casualty Company of New York are subject to a provision in the policy limiting coverage to losses "arising out of acts or omissions at the designated job site which are related to or are in connection with the work described in Item 4 of the declarations . . . ." This language is clear and unambiguous and thus is not to be interpreted by the jury

but is to be construed by the Court "according to the plain, ordinary meaning of the words by which the parties chose to contract." *Deese v. American Bankers Life Assurance Co. of Florida,* 263 S.C. 160, 208 S.E.2d 736 (1974). In this case, the "omission" (the failure to protect the heavy machinery from theft) was not related to nor connected with the construction or use of the temporary crossing at Milepost R–21–52. The omission may have been related to the construction of I–77, but leaving the bulldozer unprotected had nothing to do with the temporary crossing. The policy term, limiting coverage to omissions "related to or connected with" the work at or on the crossing, clearly refers to a situation where the crossing is being used. This is evident in the low premium for the coverage and from the agreement between Southern and Hardaway respecting the use of the crossing. Southern did all it could to prevent any accident which might arise from Hardaway's crossing of its tracks. It required a barricade to be in place when the crossing was not in use, and when it was in use Southern required the presence of one of its flagman, who had a key to the barricade, and who was in radio contact with all approaching trains. The insurance policy was purchased to protect against a risk which was present even though extensive safety precautions were taken. The bulldozer involved in the collision was not the type of machine commonly using the crossing. Crossings were by large machines which hauled dirt from one side of the tracks to the other. The bulldozer, however, was not a dirt hauler and thus did not have to cross the tracks. If Hardaway did find it necessary to move the bulldozer across the tracks, it had to go to the trouble of placing tires on the tracks to protect the tracks from the bulldozer's metal treads. This procedure was not required for the dirt haulers since they ran on rubber tires.

■ The policy covers acts and omissions. The only possible "omission" was the failure to protect the bulldozer from theft. This omission occurred at the end of a work week when the construction crew left the

job and when the temporary crossing was not in use. Clearly, such an omission had no connection with the crossing. The only possible "act" was the act of the vandals in driving the bulldozer up on the tracks. Viewing the policy as a whole, it is evident that the "act" refers to an act of Hardaway or of Southern. The policy was purchased to protect from any loss resulting from Hardaway's use of the crossing, not a criminal's use of the crossing. Therefore, the term "act" in the policy refers to an act of Hardaway or of Southern, not a criminal act of some third party. In order for Southern to recover on this policy it had the burden of presenting some evidence which provided a link between the act of omission and Hardaway's use of the crossing. This burden was not met.

Since the plaintiff failed to prove any loss arising from an occurrence covered by defendant's policy, the defendant is entitled to a directed verdict.

AND IT IS SO ORDERED.